**Below is a Memorandum Decision of the Court.**

_Mary Jo Heston_
**Mary Jo Heston**
**U.S. Bankruptcy Judge**

**(Dated as of Entered on Docket date above)**

___

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| In re:<br><br>PNW HEALTHCARE HOLDINGS, LLC, et al.,[1]<br><br>Debtors. | Chapter 11<br>Case No. 19-43754<br>(Jointly Administered)<br><br>**MEMORANDUM DECISION ON JOINT MOTION PURSUANT TO 11 U.S.C. § 365(d)** |

## I. INTRODUCTION

This matter came before the Court on May 15, 2020, on the Joint Motion of the Debtors and the Official Committee of Unsecured Creditors to Determine Date to Assume or Reject

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PNW Healthcare Holdings, LLC (9801); North Auburn Health, LLC dba North Auburn Rehabilitation & Health Center (3159); Sequim Health, LLC dba Sequim Health & Rehabilitation (7737); Bremerton Health, LLC dba Bremerton Convalescent & Rehabilitation Center (3188); Crestwood Convalescent-Port Angeles, LLC dba Crestwood Health & Rehabilitation Center (6565); Fir Lane Health-Shelton, LLC dba Fir Lane Health & Rehabilitation Center (7798); Forest Ridge Health-Bremerton, LLC dba Forest Ridge Health & Rehabilitation Center (4019); Meadow Park Health-St Helen, LLC dba Meadow Park Health & Specialty Care Center (9109); Cherrywood Place-Spokane, LLC dba Cherrywood Place (7776); Riverside Nursing-Centralia, LLC dba Riverside Nursing & Rehabilitation Center (3792); PNW Master Tenant I, LLC (9824); Franklin Hills Health-Spokane, LLC dba Franklin Hills Health & Rehabilitation Center (1763); Aldercrest Health-Edmonds, LLC dba Aldercrest Health & Rehabilitation Center (3827); PNW Master Tenant II, LLC (5319); Gardens on University-Spokane Valley, LLC dba The Gardens on University (1917); Puget Sound Healthcare Olympia, LLC dba Puget Sound Healthcare Center (4419); Care Center East Health-Portland, LLC dba Care Center East Health & Specialty Care Center (8950); LaCrosse Health-Coeur d'Alene, LLC dba LaCrosse Health & Rehabilitation Center (8594); Ivy Court-Coeur d'Alene, LLC dba Ivy Court (3197); Cornerstone Healthcare Services, LLC (1265); and CRN Pool, LLC (9083).

Unexpired Leases of Residential Real Property and for Relief from Performance of Purported Non-residential Real Property Lease Obligations under §§ 365(d)(3)[2] and 365(d)(4) ("Joint Motion"). On May 8, 2020, an objection ("Objection") to the Joint Motion was filed by Canyon Z, LLC and Canyon NH, LLC (collectively "Canyon Landlords"). On May 12, 2020, the Debtors and Official Committee of Unsecured Creditors ("Committee" and collectively "Movants") filed a reply in support of their Joint Motion ("Reply"). At the hearing, the Debtors, the Committee and the Canyon Landlords confirmed that there are no factual disputes in the record before the Court on the Joint Motion. Accordingly, the Court makes the following findings of fact and conclusions of law based on the pleadings and records filed in these bankruptcy cases.

## II. FINDINGS OF FACT

**A. Undisputed Facts Relevant to the Joint Motion.**

The Debtors are for-profit entities. The majority of the Debtors are separate limited liability companies that operate one of the Debtors' fourteen individual skilled residential nursing facilities and one assisted living facility in the states of Washington, Idaho, and Oregon ("Facilities"). As of the date of the filing of the Debtors' bankruptcy cases, there were approximately 1182 residents ("Residents") in the Facilities with a capacity of 1508. *See* Decl. of W. Masterson ISO First Day Motions ¶ 5, ECF No. 5 ("First Masterson Decl."). Approximately 77% of the Residents are funded by Medicaid. The average stay for Medicaid Residents across the Facilities is 2.38 years. The range of average stays for the remaining 23% of Residents using other payers, ranges between 18.9 and 94.3 days for the past twelve months. *See* Decl. of W. Masterson ISO Motion Re: Real Property ¶¶ 4-6 & Ex. A, ECF No. 478 ("Second Masterson Decl.").

---

[2] Unless otherwise indicated, all chapter, section and rule references are to the Federal Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

All the Facilities, except for the one owned and operated by Debtor North Auburn Health, LLC, are owned by certain special purpose entities (collectively "Formation Landlords"). EHC Elm Properties, LLC, Greenriver, Inc., the Randy Akrawi Trust dtd 12/21/2006, and the Ray & Sandra Akrawi Family Trust dtd 12/21/2006 (collectively "North Auburn Landlords") lease the facility operated by Debtor North Auburn Health, LLC pursuant to a lease dated January 1, 2019 ("Auburn Lease"). *See* Second Masterson Decl. ¶¶ 8-11 & Ex. D.

Although the documents related to that transaction are not in the court record, the Formation Landlords apparently lease the Facilities to the Canyon Landlords. Canyon Z, LLC in turn subleases the seven Facilities that are backed by Department of Housing and Urban Development ("HUD") loans[3] to Debtor PNW Master Tenant I, LLC, under the terms of a Master Sublease and Security Agreement dated December 1, 2017 ("HUD Sublease"). Canyon NH, LLC subleases the remaining seven non-HUD Facilities[4] to Debtor PNW Master Tenant II, LLC, under the terms of a separate Master Sublease and Security Agreement also dated December 1, 2017 ("Non-HUD Sublease"). The terms of the HUD Sublease and Non-HUD Sublease (collectively "Master Subleases") are substantially similar other than those provisions specifically concerning the HUD Sublease. *See* Second Masterson Decl. ¶¶ 8-10, Ex. B & C. The terms of the Master Subleases and the Auburn Lease each clearly acknowledge that the sublessees/lessees are skilled nursing or assisted living facilities. The Master Subleases include many details related to the operation of such facilities and the rights of the residents at the Facilities. *See* Second Masterson Decl. ¶ 15, Exs. B & C. All parties to both the Master

---

[3] Crestwood Convalescent-Port Angeles; Fir Lane Health-Shelton; Franklin Hills Health-Spokane; Gardens on University-Spokane Valley; Forest Ridge Health-Bremerton; Puget Sound Healthcare-Olympia; and Ivy Court-Coeur D'Alene.

[4] Bremerton Health; Riverside Nursing-Centralia; Aldercrest Health-Edmonds; Care Centers East Health-Portland; Sequim Health; Cherrywood Place-Spokane; Meadow Park Health-St Helens; and Lacrosse Health-Coeur D'Alene.

Subleases and the Auburn Lease contemplated that the Facilities would be used as skilled nursing or assisted living facilities.

The Debtors continue to perform all other obligations under the Master Subleases and the Auburn Lease including the payment of postpetition rent to the Canyon Landlords and the North Auburn Landlords.[5]

**B.  Status of Case Relevant to the Joint Motion.**

Each of the Debtors, other than Cornerstone Healthcare Services, LLC and CRN Pool, LLC, filed Chapter 11 petitions on November 22, 2019. Cornerstone Healthcare Services, LLC and CRN Pool, LLC, filed their petitions on January 20, 2020. Orders have been entered directing joint administration of the Debtors' Chapter 11 cases under the lead case of PNW Healthcare Holdings, LLC. The Debtors remain in possession and no trustee has been appointed.

On February 7, 2020, the Canyon Landlords filed a Motion for Relief from Automatic Stay ("Relief from Stay Motion"). A preliminary hearing on the Relief from Stay Motion was held on March 12, 2020, and a final hearing is currently scheduled for June 2, 2020.

On February 13, 2020, the Debtors filed Debtors' Motion for Entry of an Order Extending the Time to Assume or Reject Unexpired Leases of Nonresidential Real Property ("Motion to Extend"). On February 27, 2020, the Committee filed a joinder in the Debtors' Motion to Extend. On March 10, 2020, the Court entered an Order Extending the Time to Assume or Reject Unexpired Leases of Nonresidential Real property, which extended "the period within which the Debtors may assume or reject the Debtors' unexpired leases of nonresidential real property by an additional 90 days, up to and including June 19, 2020." Order on Motion to Extend 2:22-24, ECF No. 410.

---

[5] It appears that the Debtors are current based on postpetition invoiced amounts, although the last few cash collateral budgets reflect a rent amount that is slightly lower than apparently invoiced by the Canyon Landlords. *See* Second Masterson Decl. ¶ 13. This discrepancy has not been fully explained.

On March 30, 2020, the Court entered an Order Extending Exclusivity Periods for Filing and Confirming Plan. Pursuant to this order, the Debtors' exclusive period to file a plan was extended to May 20, 2020, and the period to solicit acceptances was extended to July 19, 2020. A Second Motion to Extend Exclusive Periods for Filing and Confirming Plan was filed on May 14, 2020, which is scheduled for a status conference on May 22, 2020.

### III.  DISCUSSION AND CONCLUSIONS OF LAW

**A.  Introduction.**

In the Joint Motion, the Movants seek entry of an order (i) determining that the deadline pursuant to § 365(d)(4) to assume or reject leases of nonresidential real property does not apply to the Debtors' leases for their Facilities; and (ii) determining that the other obligations of lessors of nonresidential real property under § 365(d)(3) and (d)(4) are not applicable.[6]

Under Rule 6006, the Court has authority to determine whether the Master Subleases are nonresidential in the context of a contested proceeding pursuant to Rule 9014. Contrary to the suggestion of the Canyon Landlords, the Court's threshold determination regarding the nature of the Master Subleases is not a proceeding to determine the "extent of . . . other interest in property" under Rule 7001(2), which generally includes "such matters as disputes as to the ownership of stock in the debtor, the extent of a debtor's interest in partnership property and whether mortgaged property belongs to the debtor." 10 *Collier on Bankruptcy* ¶ 7001.03[3] (16th ed. 2020). Therefore, Rule 7001(9), governing declaratory judgments, also is inapplicable. "If declaratory relief falls outside of the types covered by those specified clauses, an adversary proceeding is unnecessary." 10 *Collier on Bankruptcy* ¶ 7001.10 (16th ed. 2020);

---

[6] Based on the language of the Proposed Order, the Joint Motion appears only to seek a determination as to the Master Subleases, not the Auburn Lease. It is not clear whether this was an oversight, or whether the Movants intend to submit a separate order for the Auburn Lease. Even if the latter, however, service on the North Auburn Landlords is deficient under Rule 7004(c)(3). Thus, the Movants will need to either re-serve the Joint Motion on the North Auburn Landlords or submit an agreed order.

*see In re Wallace*, 122 B.R. 222, 226 (Bankr. D. N.J. 1990) (holding that the threshold determination of whether an executory lease exists in the first instance does not require an adversary complaint but may be accomplished by motion as a contested matter under Rule 9014).

**B.  Section 365(d) and its Evolution Under Relevant Amendments.**

**1.  The 1978 Version of § 365.**

Section 365 of the Bankruptcy Code governs the assumption, assignment or rejection of executory contracts and leases of a debtor in bankruptcy. In the original version of § 365 enacted in the 1978 Bankruptcy Code ("1978 Code"), Congress attempted to balance the rights of debtors and non-debtor parties to these contracts and leases, reflecting some of the practical realities in the context of the different types of bankruptcy cases and different factual contexts (e.g., non-debtor leases, financial accommodations). In doing so, Congress gave the bankruptcy courts substantial discretion to address the needs of particular bankruptcy cases, especially regarding deadlines for assumption or rejection. *See* 1978 Code, Pub. L. No. 95-598, § 365, 92 Stat. 2549, 2574 (1978).

Relevant to the Joint Motion, under the 1978 Code, § 365(d) created a general approach to the deadlines for assumption or rejection of an executory contract or lease depending on the type of bankruptcy case. In a chapter 7 bankruptcy, a trustee was required to decide whether to assume or reject within 60 days *unless* the court *extended* such deadline based on a motion filed prior to the expiration of the 60-day period. In all other cases filed under chapters 9, 11 or 13, the trustee (or debtor in possession, as applicable) had until confirmation of the plan[7] *unless* the court *reduced* such period on request of a party to such contract or lease. There was no

---

[7] These chapters reflected the then-existing types of bankruptcy that required the filing of a plan and that contemplated some level of reorganization of debts including, in some instances, the debtor's postpetition obligations. Further, as reflected in the Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. 93-137, pt. I & II (1973), leases of a debtor are often critical to reorganization, particularly the ability to assume such leases.

distinction made in this deadline provision between residential and nonresidential property. Rather the distinction in the deadlines for assumption or rejection was based solely on the applicable bankruptcy chapter involved. This original difference in the assumption and rejection deadlines between chapter 7 and other bankruptcy chapters reflects the fundamental differences in the general timing, nature, and purpose of chapter 7 versus the chapters primarily focused on reorganizing debts. While chapter 7 is designed to facilitate a relatively quick liquidation, chapters 9, 11 and 13 are designed usually to reorganize the debtor. When liquidating, it makes sense for lease assumption and rejection issues to be decided quickly. Generally, in a reorganization context, however, such issues and multiple aspects of the debtor and non-debtor party's relationship are more appropriately dealt with in the context of a plan. *See generally* B *Collier on Bankruptcy* App. Pt. 4(c), at 457 (16th ed. 2020) (reprinting Report of the Commission on the Bankruptcy Laws of the United States, H.R. DOC. NO. 93-137, pt. I, ch. 8.A.6. Executory Contracts and Unexpired Leases (1973)) (discussing in the context of § 365's refusal to give effect to *ipso facto* clauses that leases of a debtor are often critical to reorganization, particularly in terms of the continuing ability of a party to assume such leases).

Since its original enactment, § 365 has been amended numerous times to address instances where Congress deemed it appropriate to alter the original balance of statutory protections and limitations between debtors and non-debtors and other affected parties in the context of various types of leases and contracts. Two such amendments have direct bearing on the § 365(d) issues before this Court under the Joint Motion: the 1984 and 2005 Amendments.

**2.    The Amendments to § 365.**

In 1984, Congress amended § 365(d) by inserting the undefined terms "unexpired lease of *residential* real property" or of "personal property" into subsections (d)(1) and (d)(2), as well as adding new subsections (d)(3) and (d)(4) that addressed the treatment of an "unexpired

lease of *nonresidential* real property." Pub. L. No. 98-353, § 362, 98 Stat. 333 (1984) ("1984 Amendments") (emphasis added). New subsection (d)(3) required performance of the obligations of the debtor under the lease of nonresidential real property but allowed the court to extend such obligations for up to 60 days after the order for relief.[8] New subsection (d)(4) further provided for deemed rejection and immediate surrender of the nonresidential real property if the trustee did not assume the lease of such property within 60 days or such later time allowed by the court upon motion made within such time. The clear focus of the 1984 Amendments to § 365(d) was to lessen the burden on shopping center landlords and other nearby tenants. H.R. CONF. REP. 98-882 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 576, 598-99.

Section 365(d) remained substantially the same from 1984 until 2005. The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 365, 119 Stat. 23 (2005) ("2005 Amendments").[9] During this intervening period there were many retail bankruptcy cases involving stores that were large anchor tenants at shopping malls. Bankruptcy courts had significantly extended the time to assume or reject, often to permit the estate to monetize the value of such debtor's leases through the sale of designation rights or otherwise. *See, e.g.*, *In re Ernst Home Ctr., Inc.*, 209 B.R. 974, 983 (Bankr. W.D. Wash. 1997);

---

[8] Section 365(d)(3) has not been further amended since 1984 and currently provides:
> The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60-day period. This subsection shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (f) of this section. Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.

[9] Section 365(d)(1) was amended in 1986 simply to add chapter 12 as one of the rehabilitation chapters identified in subsection (d)(2) in connection with the addition of chapter 12 generally as a new type of rehabilitation bankruptcy. Pub. L. 99-554, § 257(j), 100 Stat. 3088 (1986).

*see also In re Ernst Home Ctr., Inc.*, 221 B.R. 243, 253 (9th Cir. BAP 1998) (Russell, J., concurring). In 2005, Congress amended § 365(d)(4) to limit the bankruptcy court's discretion in extending the deadline to assume or reject leases of nonresidential real property as follows:

> (A) Subject to subparagraph (B), an unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected, and the trustee shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of --
> 
>   (i) the date that is 120 days after the date of the order for relief; or
>   (ii) the date of the entry of an order confirming a plan.
> 
> (B) (i) The court may extend the period determined under subparagraph (A), prior to the expiration of the 120-day period, for 90 days on the motion of the trustee or lessor for cause.
> 
>   (ii) If the court grants an extension under clause (i), the court may grant a subsequent extension only upon prior written consent of the lessor in each instance.

§ 365(d)(4).[10]

The 2005 Amendments' legislative history again focused on the issues in retail properties, primarily in shopping malls. *See* H.R. REP. NO. 109-31, pt. II, at 427-28, 586-87 (2005) (repeatedly referencing the focus on retail debtors; noting that the National Retail Federation was one of the strongest supporters of the legislation). Section 365 has not been changed since the 2005 Amendments. Except for the changes made to § 365(d)(3) and (4) restricted to cases involving nonresidential real property, Congress generally has left the bankruptcy courts with significant ongoing discretion to make decisions based on the facts of individual cases. This discretion includes the control over decisions impacting the relative burdens and benefits, and the relationship between the debtor and non-debtor parties, including when to require assumption or rejection, the extension of exclusivity, and what forms of ongoing adequate protection/adequate assurance are required.

**C.     Meaning of "Nonresidential" vs. "Residential" Real Property in § 365.**

The Court's decision most immediately impacts the deadline by which the Debtors will

---

[10] Section 365(d)(4) has not been further amended since 2005.

be required to assume or reject the Master Subleases and Auburn Lease.[11] If the leases are determined to be of "nonresidential real property," § 365(d)(4) applies and the leases must be assumed or rejected on or before June 19, 2020, absent consent of the Landlords (i.e., the 210th day following the order for relief). If the leases are determined to be of "residential real property," § 365(d)(2) applies and the Debtors can assume or reject any time up until plan confirmation, unless the Court orders earlier assumption upon motion of the Canyon Landlords.[12]

As noted above, the statute does not define the terms "residential" and "nonresidential." Further, there is no binding precedent in any circuit including the Ninth Circuit. Accordingly, this Court and others are left to determine the meaning based on the language of the statute, the legislative history, and the use and placement of subsection 365(d) relative to other provisions of § 365. Prior decisions have relied on one of two substantially different approaches to determine if the lease at issue is of residential or nonresidential property. The first approach, used in a minority of cases, focuses on the nature of the lease and includes all commercial leases where the debtor/lessee is in the business of generating income, within the terms "lease of nonresidential real property" ("Lease Test"). *See In re Passage Midland Meadows Operations, LLC*, 578 B.R. 367 (Bankr. S.D. W. Va. 2017) (concluding that leases for facilities

---

[11] The Debtors have not sought, nor is the Court making any determinations regarding the amount of rental payments. The Debtors continue to pay postpetition rent at the invoiced amount and have acknowledged that unpaid rent would be an administrative expense that must be dealt with shortly in the context of a plan along with the substantial prepetition amounts owing. Absent evidence to the contrary, there is a presumption that the lease rate is the fair market value of the premises. *See In re DVI, Inc.*, 308 B.R. 703, 708 (Bankr. D. Del. 2004); *In re K-Fabricators, Inc.*, 135 B.R. 654, 659 (Bankr. W.D. Wash. 1992).

[12] The Canyon Landlords argue in their Objection that the Court should order the Debtors to decide whether to assume or reject the Master Subleases by June 19, 2020. However, this issue is not presently before the Court, and the Canyon Landlords must file a motion and set it for hearing with proper notice if they seek such relief after reviewing this decision. Achieving this result in this case likely would be a pyric victory given the many regulations and protections granted to residents of skilled nursing facilities upon the change in ownership and the needs to transfer to a licensed operator. *See Texas Health Enters., Inc.*, 255 B.R 181, 185 (Bankr. E.D. Tex. 2000) (denial of relief from stay in nursing home case after expiration of the deadline to assume or reject).

providing assisted living, skilled nursing, independent living and dementia care are nonresidential); *In re Emory Props., Ltd.*, 106 B.R. 318 (Bankr. N.D. Ga. 1989) (concluding that a hotel lease is nonresidential even though three employees reside on the property); *In re Sonora Convalescent Hosp., Inc.*, 69 B.R. 134 (Bankr. E.D. Cal. 1986) (concluding that the commercial intent of a lease for a convalescent hospital is determinative); *In re Condo. Admin. Servs., Inc.,* 55 B.R. 792 (Bankr. M.D. Fla. 1985) (concluding a mobile home park lease is nonresidential based on the nature of the lease and not the use of the property as a residence). Except for the *Passage Midland case*, the foregoing cases fail to explain the rationale for their decisions, and the facts in *Passage Midland* are distinguishable because the leases terminated prepetition.

Most of courts addressing the issue focus on the nature of the leased property and whether people reside on such property ("Property Test"). *See In re Michael H. Clement Corp.*, 446 B.R. 394 (N.D. Cal. 2011) (applying the nature of the property test to determine that property upon which the debtor operates his business and resides is residential); *In re Memory Lane of Bremen, LLC*, 535 B.R. 901 (Bankr. N.D. Ga. 2015) (holding that senior long-term care facility leases are not nonresidential real property leases); *Texas Health*, 255 B.R. 181 (concluding that nursing home leases are residential leases); *In re Bonita Glenn II*, 152 B.R. 751 (Bankr. S.D. Cal. 1993) (concluding that a ground lease of real property where the debtor constructed an apartment building is not a lease of nonresidential real property); *In re Care Givers, Inc.*, 113 B.R. 263 (Bankr. N.D. Tex. 1989) (concluding that a nursing home lease is residential even though it had both a residential and nonresidential aspect); *In re Indep. Vill., Inc.*, 52 B.R. 715 (Bankr. E.D. Mich. 1985) (concluding that a life-care facility for senior citizens is residential because people lived on the property).

This Court concludes that the Property Test and its focus on the use of the property is most consistent with the language of § 365(d), its usage in the broader context of § 365, and

the legislative history of the 1984 and 2005 Amendments. A basic tenant of statutory construction is that where the language of a statute is plain, "the sole function of the court is to enforce it according to its terms." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (citation and internal quotations omitted).

Section 365 uses the terms "nonresidential" or "residential" as adjectives to modify "real property," not "lease." While the phrase "lease of nonresidential property" is broader than property located in shopping centers, equating such language to all commercial leases is inconsistent with its use within either subsection (d) or elsewhere in § 365. As the court in *Care Givers* recognized in criticizing the Lease Test:

> For the statute to have the meaning movants contend the adjective "nonresidential" should be transmuted into "commercial" and moved back before the word "lease." Congress could have so provided, but did not. The plain meaning of the phrase used in the statute, "lease of nonresidential real property," is not synonymous with the phrase "commercial lease of real property." In the statute the adjective "nonresidential" modifies "real property" thereby focusing on the character of the real property, not the character of the lease.

*Care Givers*, 113 B.R. at 266.

The focus on the nature of the property leased in deciding the meaning of the statutory language also is consistent with the rest of § 365. Section 365 uses the terms "unexpired lease" throughout when Congress's focus is on the character of the lease and, in contrast, uses descriptive adjectives describing the type of property where it adjusts the basic rules related to assumption, rejection or assignment. *See, e.g.*, § 365(b)(3) (providing a specific definition to "adequate assurance" for a lease of real property in a shopping center); § 365(d)(5) (addressing performance obligations of personal property "other than personal property leased to an individual primarily for personal, family, or household purposes"). Additionally, as noted above, until 2005, the statutory structure regarding the deadline for assumption or rejection was to provide a general structure for chapter 7 cases, which presumed an assumption or rejection within 60 days absent the trustee's motion to extend such period, and an alternative structure

for the remaining reorganization chapters. The other chapters presumed that assumption or rejection would happen in the broader context of a plan, unless the non-debtor party moved the court for an early deadline, leaving the adjustment of all such statutory deadlines within the sound discretion of the court based on the facts and circumstances of the case. Given that the 2005 Amendment to § 365(d)(4) is an exception to the above described general statutory structure, this Court is not willing to conflate the terms "lease of nonresidential real property" with commercial income-producing leases without a clear congressional intent to do so. *See Indep. Vill.,* 52 B.R. at 722 ("When the Code establishes both a rule and its exception, the exception should be narrowly construed.").

The available legislative history in fact provides no such legislative intent and instead focused on retail nonresidential properties that were vacant and impacting adjacent property owners and mall owners. *See* Section III. B. 2, pp. 8-10 (discussing § 365's legislative history); *see also Care Givers*, 113 B.R. at 266-67 (citing 130 Cong.Rec.S. 8894-95 (daily ed. June 29, 1984), *as reprinted in* 1984 U.S.C.C.A.N. 576, 599). Significantly, there is nothing in the legislative history to § 365 or its amendments that addresses the many concerns for residents of nursing homes, multifamily apartment buildings, or other types of residential property that likely would exist if Congress's intent was to include such properties within the definition nonresidential real property. As noted by the court in *Care Givers*, such a broad application of § 365(d)(4) would require immediate surrender of the property if not timely assumed, which would produce "unsensible and unintended circumstance by requiring immediate surrender of real property where people live and depend upon a licensed operator." *Care Givers*, 113 B.R. at 267. Although § 365(d)(4) is not limited by its terms to shopping centers, as did the court in *Indep. Village*, this Court has "serious doubts that the section was meant to apply to the instant 'lease[,]'" also of a life-care facility, "and we thus see no reason to give as broad a reading to that term as the [lessor] advocates." *Indep. Village*, 52 B.R. at 722. The Court agrees that

1  Congress never contemplated this result and "[n]o legislative intent can be inferred from the
2  legislative history which contradicts the plain language of the statute restricting § 365(d)(4) to
3  nonresidential real property." *Care Givers*, 113 B.R. at 267.

4      In sum, the Court holds that the correct focus of the definition of residential real property
5  versus nonresidential real property should be on the intended use of such property under the
6  lease. In the case at hand, there is no dispute that the Canyon Landlords were aware of and
7  intended that the Debtors' facilities would be used as skilled residential nursing facilities or
8  assisted living facilities. Further, as represented in the Joint Motion, the Master Subleases
9  expressly recognize the residential nature of the Debtors' use of the Facilities by referring to
10  "resident," "residents," or residential" no fewer than 40 times. *See* Second Masterson Decl.
11  Exs. B and C; *see also* paragraph 22.4 of the Master Subleases (providing in part, "<u>Agreements
12  with Residents</u>. . . . Landlord [Canyon Z, LLC] shall recognize the rights of the residents under
13  the Occupancy Agreements. The termination of this Lease by Landlord shall not affect the
14  residents' rights under the Occupancy Agreements."). There also is no dispute that most of the
15  Residents at the Facilities are long-term residents living at the facilities for over two years.
16  Second Masterson Decl. ¶ 4.

17      Based on the foregoing, the Court concludes that the Master Subleases between the
18  Canyon Landlords and the Debtors PNW Master Tenant I, LLC and PNW Master Tenant II,
19  LLC, are leases of "residential real property" not nonresidential, thereby making § 365(d)(2)
20  applicable to such Master Subleases rather than § 365(d)(3) and (4).

21                    / / / End of Memorandum Decision / / /